UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RODNEY SANCHEZ, *on behalf of himself, FLSA Collective Plaintiff and the Class*, CHRISTOPHER CABREJA, and STACY BUIE,

Plaintiffs,

-v.-

CLIPPER REALTY, INC., *doing business as* CLIPPER REALTY; CLIPPER REALTY OP L.P., *doing business as* CLIPPER REALTY L.P.; CLIPPER REALTY CONSTRUCTION LLC; CLIPPER 107 CH LLC, *doing business as* CLOVER HOUSE; and CLIPPER EQUITY LLC, *doing business as* CLIPPER EQUITY,

Defendants.

21 Civ. 8502 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Rodney Sanchez brought this collective and class action for violations of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-219, and the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 190-199-a, 650-665, against his alleged former employers — Defendants Clipper Realty, Inc.; Clipper Realty OP L.P.; Clipper Realty Construction LLC; Clipper 107 CH LLC; and Clipper Equity LLC (collectively, "Defendants"). After the Court granted in part Mr. Sanchez's motion for conditional certification of a FLSA collective action, Christopher Cabreja and Stacy Buie opted into the lawsuit as Plaintiffs (together with Mr. Sanchez, "Plaintiffs"). Before the Court now are Plaintiffs' motion to certify a class and appoint class counsel under Federal Rule of Civil Procedure 23 as well as Plaintiffs' motion for partial summary judgment under

Federal Rule of Civil Procedure 56.  For the reasons set forth below, the Court

grants both motions.

## BACKGROUND[1]

The Court assumes familiarity with the factual and procedural

background of this litigation and incorporates by reference the facts set forth in

its October 31, 2022 Opinion and Order resolving Defendants' motion to

compel arbitration and partial motion to dismiss ("MTD Op." (Dkt. #55)), and

its June 25, 2024 Opinion and Order resolving Mr. Sanchez's motion for

conditional certification of a FLSA collective action and for equitable tolling

---

[1]    This Opinion draws its facts primarily from Plaintiffs' First Amended Complaint (the "FAC" (Dkt. #34)), the operative pleading in this matter, and from the parties' submissions in connection with Plaintiffs' motions for class certification and for partial summary judgment.  Those submissions include: Plaintiffs' Rule 56.1 Statement of Material Facts ("Pl. 56.1" (Dkt. #155)); the Declarations of C.K. Lee ("Lee Decl." (Dkt. #157)), Stacy Buie ("Buie Decl." (Dkt. #158)), and Christopher Cabreja ("Cabreja Decl." (Dkt. #159)) in support of both motions, as well as the exhibits attached thereto ("[Name] Decl., Ex. [ ]"); Defendants' Rule 56.1 Counter Statement of Material Facts ("Def. 56.1" (Dkt. #192-1)) and Defendants' Response to Plaintiffs' Rule 56.1 Statement of Material Facts ("Def. 56.1 Resp." (Dkt. #192-2)); and the Declaration of Adam P. Grogan ("Grogan Decl." (Dkt. #192-3)) and the exhibits attached thereto ("Grogan Decl., Ex. [ ]").

Citations to the parties' Rule 56.1 Statements incorporate by reference the documents and deposition testimony cited therein.  *See* Local Rule 56.1(d).  In general, where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Rule 56.1(c), (d); *Biberaj* v. *Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." (internal quotation marks omitted) (quoting *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009))).

For ease of reference, the Court refers to Plaintiffs' memorandum of law in support of their motion for class certification as "Pl. Class Cert. Br." (Dkt. #152), to Defendants' memorandum of law in opposition to Plaintiffs' motion for class certification as "Def. Class Cert. Opp." (Dkt. #193), and to Plaintiffs' reply memorandum of law as "Pl. Class Cert. Reply" (Dkt. #197).  Similarly, the Court refers to Plaintiffs' memorandum of law in support of their motion for partial summary judgment as "Pl. SJ Br." (Dkt. #156), to Defendants' memorandum of law in opposition to Plaintiffs' motion for partial summary judgment as "Def. SJ Opp." (Dkt. #192), and to Plaintiffs' reply memorandum of law as "Pl. SJ Reply" (Dkt. #196).

("Conditional Cert. Op." (Dkt. #111)).  Below, the Court provides a brief factual and procedural background as relevant to the motions at issue here.

## A.      Factual Background

### 1.      The Named Parties and the FAC

From September 2019 to September 2020, Plaintiff Rodney Sanchez worked as a porter at a residential property located at 107 Columbia Heights in Brooklyn ("Clover House").  (FAC ¶ 41).  During that time, Mr. Sanchez also covered shifts at another building located at 50 Murray Street in Manhattan. (Pl. 56.1 ¶ 59; Dkt. #84 at ¶ 4).  Similarly, Christopher Cabreja, who later opted into the lawsuit as a Plaintiff (Dkt. #123), worked as a porter and doorman at Clover House from July 2019 to December 2019 (Cabreja Decl. ¶ 1); and Stacy Buie, who also opted into the lawsuit as a Plaintiff (Dkt. #124), worked at Clover House and 50 Murray Street as a doorman and concierge "for a few months in 2019" (Buie Decl. ¶ 1; Pl. 56.1 ¶ 63).

Defendants are in the business of buying, selling, developing, and managing residential and commercial properties in the New York area.  (FAC ¶ 9).  Specifically, Clipper Realty, Inc., a business corporation incorporated in Maryland with its principal place of business in New York, is the parent company of Clipper Realty OP L.P., Clipper Realty Construction LLC, and Clipper 107 CH LLC (collectively, "Clipper Realty" or the "Clipper Realty Defendants").  (*Id.* ¶¶ 10, 18; Pl. 56.1 ¶ 6).  Clipper Equity LLC is a limited liability company incorporated in New York ("Clipper Equity" or the "Clipper Equity Defendant").  (FAC ¶ 22; Pl. 56.1 ¶ 5).  Collectively, Defendants own and

3

operate buildings with "thousands of residential units," including Clover House and 50 Murray Street.  (FAC ¶¶ 13-14).

In the FAC, Mr. Sanchez alleged that Defendants subjected him and similarly situated employees to classwide unlawful labor practices under the FLSA and the NYLL: (i) Defendants violated the FLSA by failing to pay them their full amount of wages "because of unpaid training time [and] time shaving, including overtime wages"; and (ii) Defendants violated the NYLL by failing to pay them their full amount of wages as a result of time shaving, pay them their wages on a weekly basis in contravention of NYLL § 191(1)(a)(i), and provide them with proper wage and hour notices and wage statements as required by the NYLL.  (FAC ¶¶ 58-75).[2]  To substantiate those claims, Plaintiffs sampled the time and pay records of 75 members — or 12.5 percent — of the putative class, deposed an executive at Clipper Realty, and received responses to interrogatories from Defendants during discovery, among other evidence gathered to support both their class certification and partial summary judgment motions.  (Lee Decl. ¶¶ 9, 14, 26; *see generally id.*; Dkt. #130, 139).

### 2.    Plaintiffs' Proposed Rule 23(b)(3) Class

At this stage of the litigation, Plaintiffs seek the certification of a Rule 23(b)(3) class of "all current and former non-exempt workers employed as a porter, doorman/concierge, handyman, and/or custodian at any of Clipper Realty's New York complexes on or after … October 15, 2015," covering the six

---

[2]    The FAC also included two counts specific to Mr. Sanchez that are irrelevant to the class certification and partial summary judgment motions currently before the Court. (*See* FAC ¶¶ 76-85).

4

years preceding the filing of the complaint in this case.  (Dkt. #152-1).

Plaintiffs define Defendants' complexes to include the following 22 properties:

### Clipper Realty Buildings

(i) 50 Murray Street, New York, NY 10017
(ii) 107 Columbia Heights, Brooklyn, NY 11201
(iii) 53 Park Place, New York, NY 10007
(iv) 1955 First Avenue, New York, NY 10029
(v) 10 West 65th Street, New York, NY 10023
(vi) 250 Livingston Street, Brooklyn, NY 11201
(vii) 141 Livingston Street, Brooklyn, NY 11201
(viii) 255 Schermerhorn Street, Brooklyn, NY 11201
(ix) 955 Dean Street, Brooklyn, NY 11238
(x) 1403 New York Avenue, Brooklyn, NY 11210
(xi) 1010 Pacific Street, Brooklyn, NY 11238

### Clipper Equity Buildings

(i) 70 Battery Place, New York, NY 10280
(ii) 21 West 86th Street, New York, NY 10024
(iii) 125 Parkside Avenue, Brooklyn, NY 11228
(iv) 215 East 19th Street, New York, NY 10003
(v) 135 W 52nd Street, New York, NY 10019
(vi) 77 Commercial Street, Brooklyn, NY 11222
(vii) 130 Hope Street, Brooklyn, NY 11211
(viii) 2360 Bedford Avenue, Brooklyn, NY 11226
(ix) 365 Bridge Street, Brooklyn, NY 11201
(x) 935 Broad Street, Bloomfield, NJ 07003
(xi) 1350 Fifteenth Street, Fort Lee, NJ 07024

(Pl. 56.1 ¶ 10; Dkt. #152-1; *see* Lee Decl., Ex. D, E).  In addition, Plaintiffs seek the certification of a subclass of "all [c]lass [m]embers who were paid, for each pay period, on a biweekly and/or some other delayed basis, resulting in a portion of [c]lass [m]embers' wages being paid over seven calendar days after the end of the week in which the wages were earned," which Plaintiffs have termed the "[b]iweekly [s]ubclass."  (Dkt. #152-1).

### 3.    Plaintiffs' Evidence of Classwide FLSA and NYLL Violations

*First*, according to Plaintiffs, all class members suffered from Defendants' common policy of scheduled pay time, time shaving, and underpayment in violation of the FLSA and the NYLL.  (FAC ¶¶ 58-75; *see* Pl. Class Cert. Br. 9; Pl. SJ Br. 2-8).  As evidence, Plaintiffs point to the sample of time and pay records for 75 class members, of which Defendants failed to maintain any time records, pay records, or both for 14 sampled class members, and of which Defendants submitted "impossibly uniform" time entries for 44 sampled class members, reflecting automatic clocking of eight hours a day.  (Pl. 56.1 ¶¶ 45-46, 53, 57; Lee Decl., Ex. R, S).[3]  For example, class member Jose A. Gomez worked for 43.08 hours during the workweek ending on April 24, 2016, but he was compensated for only 40 hours of work.  (Pl. 56.1 ¶ 56; Lee Decl., Ex. T).  Similarly, for the three named Plaintiffs, their clock-in-and-out time records provided by Defendants did not reflect their "unaltered, actual, pre-rounded, and/or unaltered clock records."  (Pl. 56.1 ¶¶ 47-52).

In addition, Plaintiffs observe that Defendants automatically deducted meal breaks from the records of 70 out of 75 sampled class members, regardless of whether they were clocked in as working through their meal break.  (Pl. 56.1 ¶ 77).  As an example, Mr. Gomez, one of the sampled class members, clocked out for only a half-hour meal break on April 19, 2016, but

---

[3]    Plaintiffs describe the sample as containing 75 class members in some parts of their papers and 72 class members in other parts.  For consistency, and based on the actual sample analysis provided in Exhibit R to the Lee Declaration, the Court uses 75 as the number throughout this Opinion.

his time schedule that day reflected a full-hour deduction for the same meal break. (*Id.* ¶ 78). Plaintiffs add that the automatic meal-break deduction seemed to operate in contravention of Defendants' common policy of requiring employees to clock-out when taking a meal break. (*Id.* ¶¶ 71-72). Isabella Benjamin, Senior Vice President at Clipper Realty, acknowledged in her deposition that Defendants did not enforce their policy of punching in and out for meal breaks. (Lee Decl., Ex. G at 8, 34, 38).

*Second*, for the biweekly subclass, Plaintiffs state that Mr. Sanchez and 14 of the sampled class members were paid on a biweekly basis, even though their work qualified for weekly payment under the NYLL. (Pl. 56.1 ¶¶ 68-69). Specifically, each of the three named Plaintiffs spent more than a quarter of their days engaged in manual tasks, thus qualifying them as manual workers according to Plaintiffs. (*Id.* ¶¶ 62, 64, 66). Plaintiffs add that class members "were also … manual workers, meaning that [they] spent more than 25% of [their] day engaging in manual tasks." (*Id.* ¶ 67). According to Ms. Benjamin, porters are "generally responsible for maintaining cleanliness," such as by cleaning up garbage, mopping, and vacuuming; handymen fix broken appliances and fixtures, such as sinks and air conditioning; and concierges are "generally sitting" and announcing guests but also deal with packages as a "big function" of their job duties. (Lee Decl., Ex. G at 67-69).

*Third*, Plaintiffs submit that Defendants failed to provide wage and hour notices for Mr. Sanchez, Mr. Buie, Mr. Cabreja, and 31 sampled class members. (Pl. 56.1 ¶ 81; *see* Lee Decl., Ex. R, W). In particular, Defendants

provided blank wage and hour notices to Mr. Sanchez, Mr. Buie, and three sampled class members.  (Pl. 56.1 ¶ 82; *see* Lee Decl., Ex. W).  Furthermore, relying on the same evidence of automatic meal-break deduction and rounding, Plaintiffs claim that Defendants' wage statements did not accurately reflect their compensation and hours.  (Pl. 56.1 ¶ 80).

### 4.    Plaintiffs' Evidence of a Single Integrated Enterprise

In seeking to impute liability to all five Defendants, Plaintiffs primarily pursue a single integrated enterprise theory.  As evidence, Plaintiffs establish that during the relevant time period, (i) all Defendants shared a common headquarters in Brooklyn, New York; (ii) Clipper Realty and Clipper Equity shared common owners, including the same C-suite executives and significant shareholders; (iii) Clipper Realty and Clipper Equity engaged in mutual service agreements with each other; (iv) executive and managerial employees were subject to transferred employment between Clipper Realty and Clipper Equity; and (v) Clipper Realty and Clipper Equity shared the same "human resources, payroll personnel, and wage compliance personnel for all putative class members."  (Pl. 56.1 ¶¶ 13-17).

Plaintiffs also state that Defendants functioned as a joint employer for all class members, referencing a common employee handbook in which Clipper Equity was described as the employer and claimed to hold hiring and firing authority, maintain records, and address all wage and employment issues.  (Pl. 56.1 ¶¶ 19-27).  Furthermore, all class members were subject to the same human resources department, payroll system and policies, and compliance

efforts under the same management team, regardless of their location of work or nominal employer. (*Id.* ¶¶ 28-33). Indeed, the same management team disciplined class members, approved or denied overtime and payroll, and set pay, bonuses, and money transfers between managed entities. (*Id.* ¶¶ 34-37). This arrangement facilitated the transfer of class members between different buildings, even those under different union contracts and with different nominal employers. (*Id.* ¶ 38).

**B.    Procedural Background**

In its prior Opinions, the Court has described the procedural background of this case in detail leading up to the resolution of Mr. Sanchez's substantive motion for conditional certification of a FLSA collective action. (*See* MTD Op. 6-8; Conditional Cert. Op. 5-8). As a result, the Court picks up here where the prior Opinions left off.

On June 25, 2024, the Court granted in part Mr. Sanchez's motion for conditional certification of a FLSA collective action, limiting the scope of the certification to a collective of porters, handymen, concierges, and repairmen who worked at Clover House, 50 Murray Street, and 53 Park Place within the three years preceding the filing of the complaint, and who were not subject to certain collective bargaining agreements. (Conditional Cert. Op. 21-23, 34). Mr. Sanchez had originally moved for certification of a collective that is almost identical to the proposed class that Plaintiffs seek to certify today. (*Id.* at 14-15). Furthermore, in the same Opinion, the Court denied Mr. Sanchez's request for equitable tolling of the FLSA's three-year statute of limitations for

9

willful violations of its overtime provisions.  (*Id.* at 26-30, 34).  Instead, Mr. Sanchez was allowed to provide notice via standard methods of distribution to putative collective members, subject to a notice period of three years prior to the filing of the complaint and a 60-day opt-in period.  (*Id.* at 25-34).

On August 1, 2024, after the notice was distributed, Stacy Buie and Christopher Cabreja opted into the lawsuit as Plaintiffs.  (Dkt. #123-124).  The Court also resolved several discovery disputes related to Plaintiffs' updated strategy of seeking class certification, including by ordering Defendants to produce a full list of buildings operated by Defendants; a class list from which the parties would randomly select a 12.5% sampling of porters, handymen, concierges, and repairmen at all 22 buildings operated by Defendants; e-discovery encompassing documents containing the terms "overtime" and "training"; and a list that identified the corporate entity associated with each of the buildings subject to class discovery.  (Dkt. #120, 130, 135, 139, 143).  In addition, on March 10, 2025, the Court denied without prejudice Plaintiffs' motion for interlocutory appeal, which sought to challenge the portion of the Court's Conditional Certification Opinion excluding from the FLSA collective those employees who were subject to certain collective bargaining agreements. (Dkt. #146).

Instead of renewing their motion for interlocutory appeal, Plaintiffs promptly moved forward with their motions for class certification and partial summary judgment.  (*See* Dkt. #144, 147, 149).  Regarding the latter motion, Plaintiffs ask that the Court find for them on Defendants' liability as a single

10

integrated enterprise or as joint employers on the classwide claims under the FLSA and the NYLL, on Plaintiffs' entitlement to liquidated damages under both statutes, and on an extended three-year statute of limitations under the FLSA based on Defendants' willful conduct.  (Dkt. #154-1).  Plaintiffs also ask for leave to file supplemental briefing on damages and attorney's fees if the Court grants partial summary judgment.  (*Id.*).

The Court set concurrent briefing schedules for both motions based on the parties' proposal.  (Dkt. #145, 148, 150).  On April 9, 2025, Plaintiffs filed their motion to certify a Rule 23(b)(3) class and supporting papers (Dkt. #152-153), as well as their motion for partial summary judgment and supporting papers (Dkt. #154-159).  Defendants opposed both motions on July 28, 2025, after unsuccessfully requesting that the Court reopen discovery based on a change in defense counsel.  (Dkt. #192-193; *see* Dkt. #190 (striking Defendants' memorandum of law requesting depositions)).  Plaintiffs filed their respective replies on August 25, 2025.  (Dkt. #196-197).  Briefing on both motions is now complete.

## DISCUSSION

### A.    The Court Determines That Defendants Operated as a Single Integrated Enterprise

As a threshold issue, the Court considers whether Defendants constitute a single integrated employer, which is relevant to and perhaps dispositive of both the class certification and summary judgment motions.  Indeed, Defendants argue that they did not operate as a single integrated enterprise to emphasize the "dissimilarities between employees in the proposed class" in the

11

class certification context as well as to avoid liability on the merits.  (Def. Class Cert. Opp. 12; Def. SJ Opp. 4-7).  While the Court understands that each motion is evaluated according to different legal standards, which the Court discusses in detail below, it determines that Plaintiffs have established that Defendants should be considered as a single integrated enterprise for purposes of both motions.

### 1.     Applicable Law

Under both the FLSA and the NYLL, a defendant must meet the definition of an "employer" to be held liable on wage and hour claims.  *See Herman* v. *RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (explaining that the FLSA's definition of an employer is expansive); *Spicer* v. *Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010) (explaining that courts have treated the definition of "employer" under the NYLL as coextensive with the definition used by the FLSA).  When there are multiple defendants, "[t]he joint employer doctrine, along with the 'single employer' (or 'single integrated employer') doctrines 'have been developed to allow a plaintiff to assert employer liability … against entities that are not her formal, direct employer.'"  *Griffin* v. *Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016) (quoting *Barbosa* v. *Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 216 (S.D.N.Y. 2010)).[4]

---

[4]     The parties in this case discuss both the single integrated enterprise theory and the joint employer doctrine, sometimes using them interchangeably.  The Court provides the applicable law for each doctrine, although it focuses its analysis on the single integrated employer theory because it finds that the circumstances of this case are better evaluated under that theory.  (*See* MTD Op. 24-30).

The single employer doctrine provides that "in appropriate circumstances, an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger single-employer entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer." *Fowler* v. *Scores Holding Co.*, 677 F. Supp. 2d 673, 681 (S.D.N.Y. 2009) (internal quotation marks omitted) (quoting *Arculeo* v. *On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005)); *accord Perez Perez* v. *Escobar Constr., Inc.*, No. 23-1240-cv, 2024 WL 3594325, at *4 (2d Cir. July 31, 2024) (summary order).

Courts use the "single integrated enterprise" test to determine whether "distinct but closely affiliated entities should be treated as a single employer for FLSA purposes," assessing factors such as the "[i] interrelation of operations, [ii] centralized control of labor relations, [iii] common management, and [iv] common ownership or financial control." *Juarez* v. *449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014) (citing *Perez* v. *Westchester Foreign Autos, Inc.*, No. 11 Civ. 6091 (ER), 2013 WL 749497, at *7 (S.D.N.Y. Feb. 28, 2013)); *see also Murray* v. *Miner*, 74 F.3d 402, 404 (2d Cir. 1996) (listing the four factors); *Flores* v. *201 W. 103 Corp.*, 256 F. Supp. 3d 433, 442 (S.D.N.Y. 2017) ("[F]acts that go to the existence of a single, integrated enterprise include ... the use of the same employees at multiple locations[,] ... [the] use of the same central payroll office[,] ... and the distribution of common employee guidelines and procedures across different businesses." (internal quotation marks omitted)

(quoting *Khereed* v. *W. 12th St. Rest. Grp. LLC*, No. 15 Civ. 1363 (PKC), 2016 WL 590233, at *4 (S.D.N.Y. Feb. 11, 2016))).

Separate from the single integrated enterprise theory, the joint employer doctrine applies "where two [or more] employers 'handle certain aspects of their employer-employee relationship jointly.'"  *Griffin*, 835 F.3d at 292 (quoting *Fowler*, 677 F. Supp. 2d at 681).  Courts apply the "economic reality" test to ascertain "whether the alleged [joint] employer possessed the power to control the workers in question," considering factors such as "whether the alleged employer [i] had the power to hire and fire the employees, [ii] supervised and controlled employee work schedules or conditions of employment, [iii] determined the rate and method of payment, and [iv] maintained employment records." *Herman*, 172 F.3d at 139 (internal quotation marks omitted) (quoting *Carter* v. *Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)); *see generally Jackson* v. *Total Relocation Servs., LLC*, No. 23 Civ. 4118 (KPF), 2024 WL 4850814, at *6 n.3 (S.D.N.Y. Nov. 21, 2024) (discussing the distinction between "single entity" doctrine of employment and "economic reality" theory of employment).

### 2.    Analysis

The five Defendants in this case operated as a single integrated enterprise.  Those Defendants are Clipper Realty — which comprises Clipper Realty, Inc. and its subsidiaries, Clipper Realty OP L.P., Clipper Realty Construction LLC, and Clipper 107 CH LLC — and Clipper Equity, which Plaintiffs argue shared common ownership, common management, interrelated

operations, and centralized control of labor relations.  (Pl. SJ Br. 15-19; Pl. Class Cert. Reply 1-3).  In its previous Opinion denying Defendants' partial motion to dismiss for lack of a single integrated enterprise, the Court determined that, on those four factors, Mr. Sanchez "ha[d] pleaded facts [in the FAC] that, taken as true, suggest that all Moving Defendants operated as part of an integrated enterprise and thus qualify as a single statutory employer." (MTD Op. 27).  Now that the parties have conducted and completed discovery, the Court finds that Plaintiffs have put forth sufficient evidence satisfying those four factors.

Since the motion-to-dismiss stage, it has been uncontested that Defendants shared common owners in David Bistricer, J.J. Bistricer, Sam Levinson, and Jacob Schwimmer.  (MTD Op. 28; *see* FAC ¶ 15).  Plaintiffs now add that all 22 buildings were owned and operated by Clipper Realty and Clipper Equity, either directly or through a subsidiary, and that all Defendants shared a common headquarters in Brooklyn, New York.  (Pl. 56.1 ¶¶ 8-13; *see* Lee Decl., Ex. C (Clipper Realty's 2025 Form 10-K filing to the U.S. Securities and Exchange Commission ("SEC"); *id.*, Ex. D (Clipper Equity's website listing properties); *id.*, Ex. E (Clipper Realty's website listing properties); *id.*, Ex. G at 8-16 (Ms. Benjamin's testimony confirming both Clipper Realty's and Clipper Equity's properties)).  On common management, Plaintiffs point to the deposition of Ms. Benjamin, who testified that she served in the same Senior Vice President role for both Clipper Realty and Clipper Equity.  (Lee Decl., Ex. G at 8, 16).  Ms. Benjamin added that Mr. David Bistricer served as Chief

15

Executive Officer and Mr. J.J. Bistricer served as Chief Operating Officer of both entities. (*Id.* at 17).

Furthermore, on interrelated operations, Ms. Benjamin testified that Defendants shared the same human resources, payroll, and wage compliance personnel, and that they set the same employment policies. (Lee Decl., Ex. G at 21, 32-34). On that factor as well as on centralized control of labor relations, Plaintiffs also proffer a common employee handbook used by all Defendants. (*Id.*, Ex. K; Pl. 56.1 ¶ 19). The handbook makes clear that (i) all benefits were provided by Clipper Equity, (ii) all employee personnel files were centrally maintained by Clipper Equity, and (iii) Clipper Equity was the employer with hiring and firing authority. (Lee Decl., Ex. K at 16, 18; Pl. 56.1 ¶¶ 19-22, 27).

Defendants do not meaningfully contest any of the above evidence. Rather, their main contention seems to be that the named Plaintiffs and some of the proposed class members were hired by Marc Gordon, an onsite residential manager employed by 50 Murray Acquisitions LLC, and that Mr. Gordon and 50 Murray Acquisitions LLC — not Clipper Realty or Clipper Equity — exercised control over Plaintiffs' payroll and overtime. (Def. SJ Opp. 5-7). In addition, Defendants argue that "each of the proposed buildings is owned by different entities" with "policies set by different groups of individuals ... [and] employees who are members of different unions subject to different [Collective Bargaining Agreements ('CBAs')] (or no union or CBA at all)." (Def. Class Cert. Opp. 12). Specifically, Defendants claim that the

16

proposed class members were supervised by different onsite residential managers, who hired them, directed their work, and managed their payroll and overtime. (*Id.*). Defendants add that pay rates were often set by CBAs with various unions. (Def. SJ Opp. 5).

Defendants' argument misses the point. Critically, Defendants have put forth no evidence disputing that they shared common ownership, executive management, and payroll systems and processes. Likewise, Defendants do not challenge the content of the common employee handbook or the testimony of Ms. Benjamin, both of which acknowledge that Clipper Equity managed all personnel records, retained ultimate hiring and firing authority, and set employment policies. The existence of various onsite residential managers employed by different subsidiaries does not refute Plaintiffs' evidence of Defendants' interrelated operations and centralized control of labor relations. As Plaintiffs put it, "that some putative class members may be subject to different union agreements[ ] or that Defendants operate[d] the buildings through subsidiary LLCs does not defeat a finding that Defendants are a single integrated enterprise." (Pl. SJ Reply 3; *see* Pl. Class Cert. Reply 3-5). The Court therefore determines that Defendants operated as a single integrated enterprise and treats them as such for both the class certification and summary judgment motions.

**B.      The Court Grants Plaintiffs' Motion for Class Certification**

   **1.      Applicable Law**

A federal district court "may not certify a class without making a ruling that each Rule 23 requirement is met." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 27 (2d Cir. 2006).  The moving party must establish that the proposed class meets all the requirements of Rule 23 by a "preponderance of the evidence." *Myers* v. *Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Critically, when evaluating whether the proposed class meets the requirements of Rule 23, the court "may not address the merits of the action except to the extent that a merits issue overlaps with a Rule 23 requirement," and any such determination "is not binding on the trier of facts at the subsequent merits stage of the action." *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008).

*First*, the party seeking class certification must show that, under Rule 23(a),

> [i] the class is so numerous that joinder is impracticable; [ii] there are questions of law or fact common to the class; [iii] the claims or defenses of the representative parties are typical of the claims or defenses of the class; and [iv] the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Those four Rule 23(a) requirements — commonly known as numerosity, commonality, typicality, and adequacy — must be satisfied upon the court's "rigorous analysis." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 33 (internal quotation marks omitted) (quoting *Gen. Tel. Co. of Sw.* v.

*Falcon*, 457 U.S. 147, 161 (1982)).  Moreover, the Second Circuit also recognizes an implicit "ascertainability" element, which requires the proposed class to be "defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017).

*Second*, in addition to satisfying the requirements of Rule 23(a), "a plaintiff must also establish that the proposed class falls into one of the three categories set forth in Rule 23(b)."  *Azor-El* v. *City of New York*, No. 20 Civ. 3650 (KPF), 2024 WL 4326921, at *7 (S.D.N.Y. Sept. 27, 2024).  Here, Plaintiffs seek to certify a class under Rule 23(b)(3), which provides that

> [a] class action may be maintained if Rule 23(a) is satisfied and if the court finds [i] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and [ii] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).  (*See* Pl. Class Cert. Br. 25-27).

Cases with wage and hour claims are "especially suited to class litigation — perhaps the most perfect questions for class treatment — despite differences in hours worked, wages paid, and wages due."  *Espinoza* v. *953 Assocs. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *Ramos* v. *SimplexGrinnell LP*, 796 F. Supp. 2d 346, 359 (E.D.N.Y. 2011), *vacated in part*, 773 F.3d 394 (2d Cir. 2014)) (collecting cases).  "Specifically, failure to pay proper minimum wages, time-shaving, improper tip pooling, and failure to provide proper wage statements or wage and hour notices are [considered to be] about the most perfect questions for class

19

treatment." *Gonzalez* v. *Hanover Ventures Marketplace LLC*, No. 21 Civ. 1347 (ER), 2024 WL 1157074, at *4 (S.D.N.Y. Mar. 18, 2024) (internal quotation marks omitted) (quoting *Martinez* v. *Ayken, Inc.*, No. 13 Civ. 7411 (LDW) (AKT), 2016 WL 5107143, at *12 (E.D.N.Y. Feb. 29, 2016)).

The court "has broad discretion in deciding how and whether to certify a class, arising from its 'inherent power to manage and control pending litigation.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 37 (S.D.N.Y. 2020) (quoting *Myers*, 624 F.3d at 547). Accordingly, the court has the power to "alter or modify the class, create subclasses, and decertify the class whenever warranted." *Sumitomo Copper Litig.* v. *Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001). The same class certification requirements apply to the certification of subclasses. *See Ramirez* v. *Riverbay Corp.*, 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014).

### 2.    Analysis

#### a.    Plaintiffs Satisfy the Requirements of Rule 23(a)

##### i.    Numerosity

The first prong of Rule 23(a) requires the class to be so large that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a)(1). While there is no strict numerical threshold, "[c]ourts have long applied a presumption that a class of forty members is sufficiently numerous." *Huang* v. *Shanghai City Corp*, No. 19 Civ. 7702 (LJL), 2022 WL 1468450, at *5 (S.D.N.Y. May 10, 2022) (citing *Robidoux* v. *Celani*, 987 F.2d 931, 936 (2d Cir. 1993)). Here, Plaintiffs wish to certify a class of "all current and former non-exempt workers employed as a

20

porter, doorman/concierge, handyman, and/or custodian at any of Clipper Realty's New York complexes on or after … October 15, 2015," covering 22 properties and six years preceding the filing of the complaint in this case.  (Dkt. #152-1).  The Court is satisfied that the proposed class contains at least 40 members — Plaintiffs' sample of 12.5 percent of the class yielded 75 class members, meaning that the total size of the class is at least 600 members.  (*See* Lee Decl. ¶ 26; *id.*, Ex. R).

In addition, Plaintiffs wish to certify a biweekly subclass of "all [c]lass [m]embers who were paid, for each pay period, on a biweekly and/or some other delayed basis, resulting in a portion of [c]lass [m]embers' wages being paid over seven calendar days after the end of the week in which the wages were earned." (Dkt. #152-1).  Plaintiffs proffer evidence showing that Mr. Sanchez and 14 of the sampled class members were paid on a biweekly basis, even though their work qualified for weekly payment under the NYLL.  (Pl. 56.1 ¶¶ 68-69).  Accepting that the records were randomly gathered and that the sample is therefore representative, which Defendants do not challenge, the Court is also satisfied that the biweekly subclass contains at least 40 members.

Defendants do not meaningfully challenge the numerical threshold or proposed sizes of the class and biweekly subclass.  Rather, Defendants argue that (i) "Plaintiffs did not work at any location outside of the three conditionally certified buildings" and (ii) Plaintiffs' class certification motion constitutes an improper expansion of the Court's conditional certification of a FLSA collective.

21

(Def. Class Cert. Opp. 14-15).  Once again, Defendants' argument misses the point.  The instant motion seeks certification of a class under Rule 23(b)(3) after additional discovery, which produced evidence that was unavailable to the Court at the time of Mr. Sanchez's motion to conditionally certify a FLSA collective action.  In terms of numerosity, the Court determines that Plaintiffs have carried their burden of showing by a preponderance of the evidence that their proposed class and subclass are so numerous that joinder would be impracticable.

### ii.    Commonality

In addition to numerosity, Rule 23(a) requires that there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Plaintiffs must show by a preponderance of the evidence that the class action will "generate common *answers* apt to drive the resolution of the litigation."  *Elisa W.* v. *City of New York*, 82 F.4th 115, 123 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011)).  In addition, the court must engage in a "rigorous analysis," which often "entail[s] some overlap with the merits of plaintiffs' underlying claim."  *Id.* (quoting *Dukes*, 564 U.S. at 351).

Such a rigorous analysis is satisfied when the injury suffered by class members "derive[s] from a unitary course of conduct by a single system."  *Marisol A.* v. *Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (per curiam).  In the context of wage and hour claims, this commonality prong "is usually satisfied where the plaintiffs allege that defendants had a common policy or practice of

22

unlawful labor practices." *Chakma* v. *Sushi Katsuei, Inc.,* No. 23 Civ. 7804 (KPF), 2025 WL 429730, at *5 (S.D.N.Y. Feb. 7, 2025) (internal quotation marks omitted) (quoting *Zivkovic* v. *Laura Christy LLC*, 329 F.R.D. 61, 69 (S.D.N.Y. 2018)).

Here, Plaintiffs contend that "all [c]lass members were subject to a common policy of compensating employees for fewer hours than their recorded ... clocked-in hours." (Pl. Class Cert. Br. 23). Plaintiffs add that for the biweekly subclass, subclass members were "all paid on a biweekly basis" despite the NYLL's requirement of paying manual workers on a weekly basis. (*Id.*). The Court agrees and finds that Plaintiffs have established those common questions by a preponderance of the evidence.

Specifically, Plaintiffs' analysis of the 75-member sample of time and pay records reflects that (i) almost all of the sampled members went through some period of time with automatic meal-break deductions and (ii) more than half of the sampled members were compensated for exactly eight-hour workdays for over 90 percent of all days worked. (Pl. 56.1 ¶¶ 46, 53, 57, 77; Lee Decl., Ex. R). The sample shows that it is more likely than not that Defendants indeed applied common policies of automatic deductions for mealtimes and eight-hour rounding across the class.

In addition, Plaintiffs proffer evidence that at least 14 of the sampled class members were paid on a biweekly basis, even though their job duties included manual tasks. (Pl. 56.1 ¶¶ 67-69; Lee Decl., Ex. R). In particular, three of the named Plaintiffs affirmed that that they spent more than a quarter

of their days engaged in manual tasks.  (Pl. 56.1 ¶¶ 62, 64, 66).  The Court also

notes that for Plaintiffs' claims related to wage and hour notices and wage

statements, the evidence demonstrates that Defendants failed to provide those

notices to the three named Plaintiffs and 31 sampled class members and that

they failed to maintain accurate statements.  (Pl. 56.1 ¶¶ 80-81; *see* Lee Decl.,

Ex. R, W).  In sum, the evidence that Plaintiffs gathered during discovery is

sufficient to convince the Court that "the claims of Plaintiffs and putative class

members arise from a common wrong: Defendants' failure to implement fair

wage and labor practices."  *Chakma*, 2025 WL 429730, at *6.

With respect to the class, Defendants do not seem to deny that there are

common policies, as they argue only that "these policies are not *per se*

unlawful." (Def. Class Cert. Opp. 16).  The illegality of the common policies,

however, is a "merits question [that the Court] need not … address[ ] in order to

decide the class certification motion[ ]." *In re Fosamax*, 248 F.R.D. at 393.

Rather, at this stage, because Plaintiffs have successfully raised and

established those unrefuted common questions by a preponderance of the

evidence, they have met the commonality prong.

Defendants go on to argue that "the determination of whether any

individual class member is entitled to any specific relief would hinge on a

highly individualized analysis of that employee's employment," including the

building at which that individual worked, the shift that individual covered, and

other details.  (Def. Class Cert. Opp. 17-18).  In other words, Defendants seem

to suggest that commonality requires uniformity.  But individual differences

24

may exist within a certified class, even when it comes to specific responsibilities, shifts covered, and hours worked, as long as those differences are "relatively minor and relate primarily to the level of damages" to which individual class members are entitled.  *Noble* v. *93 Univ. Place Corp.*, 224 F.R.D. 330, 343 (S.D.N.Y. 2004); *see Ansoumana* v. *Gristede's Operating Corp.*, 201 F.R.D. 81, 86 (S.D.N.Y. 2001) ("The differences among the [p]laintiffs as to the number of hours worked, the precise work they did, and the amount of pay they received concern the amount of damages to which any individual [p]laintiff might be entitled if and when liability is found."); *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 196 (S.D.N.Y. 1985) ("It is well-established that individual questions with respect to damages will not defeat class certification ... unless that issue creates a conflict which goes to the heart of the lawsuit.").  Here, given Defendants' common policies that likely resulted in systematic underpayment, individual relief does not defeat the issue of class certification.

Regarding the subclass, Defendants also argue that whether individual subclass members qualify as manual workers is a question that requires individualized inquiries into specific duties performed by those members.  (Def. Class Cert. Opp. 18-19).  While this question is arguably a closer call — inasmuch as being a manual worker constitutes a critical common characteristic that must be shared by this subclass — Defendants have not refuted Plaintiffs' evidence that class members with the job duties of porter, doorman/concierge, handyman, and custodian are more likely than not to spend at least a quarter of their time performing manual labor.  (*See, e.g.*, Lee

25

Decl., Ex. G at 66-69 (Ms. Benjamin testifying that employees in those positions spend the majority of their workday engaged in manual work)). Therefore, the Court determines that the subclass meets the commonality requirement as well, and it reserves the liability determination for its resolution of Plaintiffs' motion for partial summary judgment later on in this Opinion.

### iii.    Typicality

Under the third prong of Rule 23(a), Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (internal quotation marks omitted) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)). In the Second Circuit, "[t]he commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Id.*

For the same reason that Plaintiffs' proposed class and subclass meet the commonality requirement, the Court finds that typicality is satisfied as well. Plaintiffs have demonstrated that the claims of all class members arise from Defendants' common policies of automatic meal-break deductions and eight-hour rounding. Put differently, each class member relies on those common policies to prove that Defendants undercompensated them when compared with their actual time records. In addition, for the biweekly

subclass, Plaintiffs have shown that subclass members performed job duties that more than likely qualify as manual labor, but that they were compensated on a biweekly rather than weekly basis. Mr. Sanchez suffered from those common policies and was paid on a biweekly basis, thereby making his claims typical of the class.[5] Because Defendants do not raise any typicality-specific argument in their brief that is distinct from the commonality arguments that the Court has already addressed, the Court determines that Plaintiffs have met this third prong.

### iv.    Adequacy

The fourth prong of Rule 23(a) asks whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In evaluating this prong, courts must ensure that (i) "plaintiff[s'] interests are [not] antagonistic to the interest of other members of the class" and that (ii) "plaintiff[s'] attorneys are qualified, experienced[,] and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). The adequacy evaluation is intended "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 625 (1997). Critically, such conflicts "must be

---

[5]    Plaintiffs do not claim that Mr. Buie and Mr. Cabreja were also paid on a biweekly basis. Therefore, the Court determines that only Mr. Sanchez will serve as the representative for the biweekly subclass.

27

'fundamental' to violate Rule 23(a)(4)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).

Here, Defendants do not specifically challenge the adequacy prong by pointing out any conflict of interest between the named Plaintiffs and the class or any issue with proposed class counsel, and the Court finds that adequacy is satisfied in this case. All three named Plaintiffs have indicated their willingness to serve as class representatives. (Cabreja Decl. ¶¶ 13-14; Buie Decl. ¶¶ 7-8; Dkt. #84 at ¶¶ 19-20).

Furthermore, Lee Litigation Group, PLLC, Plaintiffs' proposed class counsel, has served in that role in hundreds of class actions and worked extensively on wage and hour cases. (Lee Decl. ¶¶ 27-32; *see id.*, Ex. X). The Court has no doubt that the firm will litigate vigorously on behalf of the class in this case. Finally, the Court notes that any potential concern about the named Plaintiffs' ability to represent employees who worked at Defendants' properties outside of the three buildings identified in the Court's grant of conditional collective certification does not defeat adequacy in this class certification motion, because Plaintiffs are capable of representing those employees who worked for Defendants at other locations under the theory of a single integrated employer. *See Chakma*, 2025 WL 429730, at *9 ("There is no material conflict among the class members' positions because, as the Court has previously addressed, Plaintiffs have alleged that Defendants operated [as] a single integrated employer. … As such, Plaintiffs are capable of representing the

28

employees of [all of Defendants' locations], who were subject to the same alleged misconduct.").

### v.   Ascertainability

Under Second Circuit precedent, Plaintiffs' proposed class must also be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d at 260 (internal quotation marks omitted) (quoting *Brecher* v. *Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)). The Second Circuit has described ascertainability as a "modest threshold requirement [that] will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269.

In this case, the Court agrees with Plaintiffs that the proposed class and subclass are ascertainable based on Defendants' employment records. (Pl. Class Cert. Br. 20-21). Defendants do not oppose ascertainability, and the Court notes that wage and hour classes are routinely found to be ascertainable in this District. *See Chakma*, 2025 WL 429730, at *10 (collecting cases). Here, as in other such cases, "[m]embership in the class can be ascertained by objective documentation, such as … [D]efendants' payroll records and wage statements; and no subjective criteria are required to determine the class'[s] contours." *Guan Ming Lin* v. *Benihana N.Y. Corp.*, No 10 Civ. 1335 (RA) (JCF), 2012 WL 7620734, at *12 (S.D.N.Y. Oct. 23, 2012), *report and recommendation adopted*, No. 10 Civ. 1335 (RA) (JCF), 2013 WL 829098 (S.D.N.Y. Feb. 27, 2013).

### b.    Plaintiffs Satisfy the Requirements of Rule 23(b)(3)

Because Plaintiffs seek class certification under Rule 23(b)(3), the Court must also ensure that the proposed class and subclass meet the two prongs of predominance and superiority.  It finds that those prongs are also satisfied.

### i.    Predominance

Rule 23(b)(3) first requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  While this requirement is similar to the commonality prong of Rule 23(a), the Supreme Court has explained that the standard for predominance is "more demanding."  *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 34 (2013); *Amchem*, 521 U.S. at 623-24.  Indeed, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  It is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Myers*, 624 F.3d at 547 (quoting *Moore* v. *PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)).

Here, Plaintiffs claim that Defendants "engaged in a common policy of [i] deducting from employees' compensable time …; [ii] failing to pay all employees on a weekly basis as required by [the] NYLL; [iii] failing to provide proper wage and hour notices; and [iv] failing to provide proper wage statements."  (Pl. Class Cert. Br. 26).  Plaintiffs seek to prove Defendants'

30

liability through generalized proof — namely, their analysis of the time and pay records of the 75 sampled class members.  (*See* Pl. 56.1 ¶¶ 44-83; Lee Decl., Ex. R).

While Plaintiffs' analysis was conducted on a sample rather than on the records of the entire class, the Court notes that this type of generalized proof has been approved by the Supreme Court in *Tyson Foods, Inc.* v. *Bouaphakeo*, 577 U.S. 442 (2016).  Indeed, the Supreme Court explained in *Tyson Foods* that "a representative sample is [often] 'the only practicable means to collect and present relevant data' establishing a defendant's liability," especially in the wage and hour context.  *Id.* at 455 (quoting Manual for Complex Litigation § 11.493 (4th ed. 2004)).  The Supreme Court added that a permissible way to use the sample to prove classwide liability "is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action."  *Id.*

That is exactly the case here.  Through discovery, Plaintiffs have gathered the records of 75 class members and analyzed them to find that (i) almost 95 percent of the sample had some period of time with automatic meal-break deductions and (ii) more than half of the sample had exactly eight-hour workdays for over 90 percent of all days worked.  (Lee Decl., Ex. R).  In addition, for the biweekly subclass, Plaintiffs' analysis reflects that about 20 percent of the sample had some period of time during which they were paid on a biweekly basis, despite the evidence that porters, doormen/concierges,

31

handymen, and custodians at Defendants' properties performed a substantial amount of manual work.  (*Id.*, Ex. R; *id.*, Ex. G at 67-69).

Plaintiffs intend to rely — and in fact have relied — on the sample analysis to prove Defendants' liability with respect to both the class and the subclass.  Accepting that the sample is representative, which Defendants have not challenged, the Court determines that it appropriately functions as generalized proof showing that issues common to the class predominate over individualized questions, especially because Plaintiffs are using this "representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records." *Tyson Foods*, 577 U.S. at 456.  The Court adds that the sample does not deprive Defendants of their ability to litigate individual defenses, especially on the issue of damages; it only ensures that common questions predominate to allow for class certification.  *See id.* at 457.

### ii.    Superiority

In addition, a Rule 23(b)(3) class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  To evaluate this prong, courts consider four "nonexclusive factors," *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) — that is, (i) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (ii) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (iv) "the likely difficulties in

managing a class action," Fed. R. Civ. P. 23(b)(3)(A)-(D). The purpose of the superiority prong is to ensure that the class action can "facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013).

In this case, the Court finds that a class action is superior because "potential class members are aggrieved by the same [common] polic[ies]," and "the damages suffered are small in relation to the expense and burden of individual litigation," thus rendering it unlikely that individual class members will bring actions of their own. *Whitehorn* v. *Wolfgang's Steakhouse, Inc.*, 275 F.R.D. 193, 200 (S.D.N.Y. 2011). Defendants challenge the superiority prong primarily by arguing that Plaintiffs fail to meet the commonality and predominance requirements. (*See* Def. Class Cert. Opp. 21). Because the Court disagrees and finds that common questions do indeed predominate, it is satisfied that "a class action is superior to other available methods for the fair and efficient adjudication of this litigation." (Pl. Class Cert. Br. 27).

### c.    The Court Appoints Lead Plaintiffs and Class Counsel

Under Rule 23(g), the Court must appoint class counsel for a certified class, taking into consideration factors such as "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed.

R. Civ. P. 23(g)(1)(A).  For substantially the same reasons that the Court finds that Plaintiffs and their counsel have satisfied the adequacy requirement, the Court determines that they will continue to diligently pursue this litigation. They are hereby appointed as lead Plaintiffs and class counsel.

### d.    The Court Denies Defendants' Request for Additional Discovery

In the event that the Court grants Plaintiffs' class certification motion, Defendants request permission to conduct "post-certification discovery going to the issues of whether Plaintiffs are similarly situated and to develop defenses related to the merits of the claim." (Def. Class Cert. Opp. 23).  The Court notes that Defendants have had many months to conduct discovery, with deadlines extended several times by the Court, and, further, that the Court previously denied Defendants' request to reopen discovery, in part because the Court had already decided the pertinent issues.  (*See* Dkt. #180, 190).  In addition, any individual defenses regarding specific class members can be formulated by looking at actual time and pay records, which are already in Defendants' possession.  In light of these considerations, the Court denies Defendants' request.

## C.    The Court Grants Plaintiffs' Motion for Partial Summary Judgment

### 1.    Applicable Law

Under Rule 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett,* 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Anderson*, 477 U.S. at 248). Furthermore, a particular fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Indeed, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Est. Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dall. Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Nevertheless, "[t]hough [the court] must accept as true the allegations

35

of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

### 2.    Analysis

In the remainder of this section, the Court addresses the following classwide issues on the merits: (i) whether Defendants failed to pay all wages to the class under the FLSA and the NYLL as a result of automatic meal-break deductions and rounding; (ii) whether Defendants failed to pay the biweekly subclass on a weekly basis as required by the NYLL; (iii) whether Defendants failed to provide proper wage and hour notices and wage statements as required by the NYLL; (iv) whether Plaintiffs are entitled to liquidated damages under the FLSA and the NYLL; and (v) whether the FLSA's statute of limitations should be extended in this case.

Defendants argue that it is inappropriate for the Court to decide class certification and summary judgment simultaneously, as that would deprive Defendants of the opportunity to move to decertify. (Def. SJ Opp. 1-4). The Court is aware that a "decision on the merits ... should ordinarily not occur before or simultaneous with a decision on class certification." *Cuzco* v. *Orion Builders, Inc.*, 262 F.R.D. 325, 335-36 (S.D.N.Y. 2009). Nevertheless, "[t]here is nothing in Rule 23 to preclude the Court from examining the merits of plaintiffs' claims on a proper ... Rule 56 motion simply because such a motion is returnable contemporaneously with a class motion." *Adames* v. *Mitsubishi*

36

*Bank, Ltd.*, 133 F.R.D. 82, 87 n.1 (E.D.N.Y. 1989) (citing *Lorber* v. *Beebe*, 407 F.Supp. 279, 291 (S.D.N.Y. 1975)).

Indeed, many courts in this Circuit have evaluated and decided class certification and summary judgment simultaneously, especially in the wage and hour context.  *See, e.g.*, *Canelas* v. *World Pizza, Inc.*, No. 14 Civ. 7748 (ER), 2017 WL 1233998, at *1 (S.D.N.Y. Mar. 31, 2017) (granting both motions in part in a case with FLSA and NYLL claims); *Vega* v. *Credit Bureau Enters.*, No. 02 Civ. 1550 (DGT) (KAM), 2005 WL 711657, at *10 (E.D.N.Y. 2005) (granting both motions).  In addition, the Court notes that Defendants did not file a letter raising objections when the Court set a simultaneous briefing schedule or flag any concerns until they filed their summary judgment papers several months later, thereby implicitly waiving their right to object.  *See Mendez* v. *The Radec Corp.*, 260 F.R.D. 38, 45, 49 (W.D.N.Y. 2009) (concluding that the defendants had "waived any objection to class counsel's simultaneous filing of, and the Court's decisions on, plaintiff's motions for partial summary judgment and for class certification").

### a.    Defendants Are Liable for Failing to Pay All Wages Under the FLSA and the NYLL

#### i.    Burden Allocation

Before reaching the issue of liability, the Court first addresses Plaintiffs' argument that Defendants' failure to maintain accurate records shifts the burden to Defendants to prove that they did indeed pay all wages.  (*See* Pl. SJ Br. 2-5).  Under NYLL Section 196-a, when an employer fails to keep adequate records, "[t]he burden … shifts to [the employer] to prove that '[its employees

37

were] paid wages, benefits[,] and wage supplements.'" *Chichinadze* v. *BG Bar Inc.*, 517 F. Supp. 3d 240, 255 (S.D.N.Y. 2021) (quoting NYLL § 196-a).  The employer "cannot discharge this burden merely by 'undermining the reasonableness' of [the employees'] evidence that [they were] unpaid."  *Id.* (quoting *Gamero* v. *Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 (S.D.N.Y. 2017)).  Rather, the employer "must [affirmatively] demonstrate that it in fact paid its employees."  *Gamero*, 272 F. Supp. 3d at 498.

Similarly, in the event of inadequate records, the FLSA also allows employees to submit only "sufficient evidence from which violations of the FLSA and the amount of an award may be reasonably inferred."  *Gamero*, 272 F. Supp. 3d at 497 (internal quotation marks omitted and alteration adopted) (quoting *Gonzalez* v. *Masters Health Food Serv. Inc.*, No. 14 Civ. 7603 (VEC), 2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017)).  While the FLSA does not explicitly shift this initial burden of proof, thereby still allowing the employer to undermine the reasonableness of the employees' evidence, it does lower the employees' burden.  *See id.* at 497-98.  Moreover, "[i]f an employer cannot satisfy its burden under the FLSA, it cannot satisfy th[e] 'more demanding burden' of the NYLL."  *Id.* at 498 (quoting *Canelas*, 2017 WL 1233998, at *9).

Here, Plaintiffs have presented sufficient evidence that Defendants inadequately maintained employment records.  Plaintiffs' sample analysis demonstrates that Defendants did not keep any time and pay records for 20 percent of the sample and that they missed some time and pay records for about half of the sample.  (Lee Decl., Ex. R).  Altogether, Defendants failed to

maintain adequate records for about 70 percent of the sample.  (*Id.*).

Defendants do not dispute the results of this analysis, nor do they contest the

foundational premise that they failed to maintain accurate records.[6]  Therefore,

the Court agrees with Plaintiffs that the burden shifts to Defendants to prove

payment of all wages on Plaintiffs' NYLL claims.  The Court adds that Plaintiffs'

burden on the FLSA claims is also lowered as a result of Defendants'

inadequate records.

### ii.     Automatic Meal-Break Deduction

Turning to the merits, the Court starts with Plaintiffs' claim under both

the FLSA and the NYLL that Defendants' automatic meal-break deduction

policy resulted in underpayment across the class.  "The FLSA and the NYLL

both 'guarantee compensation for all work … engaged in by covered

employees."  *Salinas* v. *Starjem Rest. Corp.,* 123 F. Supp. 3d 442, 472 (S.D.N.Y.

2015) (internal quotation marks omitted and alterations adopted) (quoting

*Kuebel* v. *Black & Decker Inc.*, 643 F.3d 352, 359 (2d Cir. 2011)).  That includes

all times worked during a workday, except for a "bona fide meal period."  *Id.*  To

qualify as a bona fide meal period, an employee "must be completely relieved

from duty for the purposes of eating regular meals," meaning that the employee

is not relieved if she is "required to perform any duties, whether active or

---

[6]     Defendants contend that Plaintiffs lumped together the group of employees for whom no
        records were located with the group of employees with rounded records.  (Def. SJ
        Opp. 9).  However, because neither group had accurate records reflecting actual clock-
        in and clock-out times, Plaintiffs did not impermissibly combine the two groups.

inactive, while eating." *Id.* (internal quotation marks omitted) (quoting 29 C.F.R. § 785.19(a)).

It is true that the employee must ordinarily "prove that [s]he performed [such off-the-clock] work for which [s]he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel*, 643 F.3d at 361. But where the employer fails to maintain adequate records, the employee may satisfy her burden through estimates and reasonable inferences. *Salinas*, 123 F. Supp. 3d at 472. Indeed, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (internal quotation marks omitted) (quoting *Anderson* v. *Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), *superseded on other grounds by statute*).

Plaintiffs first argue that Defendants applied an automatic meal-break deduction of one hour each day regardless of whether Plaintiffs clocked in and out for lunch. (Pl. SJ Br. 5-6; Pl. SJ Reply 5-8). Plaintiffs have sufficiently proved the existence of such a practice with their sample analysis, which shows that almost 95 percent of the sampled class members were subjected to this automatic meal-break deduction for some period of time. (Lee Decl., Ex. R; *see also id.*, Ex. G at 34 (Ms. Benjamin acknowledging that the official policy was for employees to "punch in and punch out" for meal breaks, but that she did not believe that the policy "was enforced as a fact")). Critically, Defendants do not dispute that they implemented an automatic meal-break deduction in

40

practice, only that such a practice was not *per se* illegal.  (Def. SJ Opp. 9-12).  The Court therefore accepts that the automatic meal-break deduction took place during the relevant period.

Plaintiffs next argue that that the deduction resulted in underpayment.  To substantiate this argument, Plaintiffs reference the example of the time and pay records of class member Mr. Gomez, who punched in and out for meal breaks that lasted shorter than an hour but who saw automatic hour-long deductions for his meal breaks.  (Pl. SJ Br. 7; Lee Decl., Ex. T).  In addition, Plaintiffs submit the declarations of the three named Plaintiffs and two other class members, who attested to lost wages from the automatic meal-break deductions.  (Pl. SJ Br. 8; Pl. SJ Reply 6).  In response, Defendants challenge the sufficiency of Plaintiffs' evidence showing underpayment, arguing that the burden was on the employee to report uncompensated work and that

> [t]o the extent that any employees did voluntarily clock-in prior to the expiration of their full uncompensated meal period, there is no evidence in Plaintiffs' motion or in the record that those individuals advised Defendants that they were doing so, as is required, or that any employee performed compensable work during that time, whenever it may have occurred.

(Def. SJ Opp. 10).  Furthermore, Defendants reference the declaration of Mr. Gordon, who stated that he would never ask an employee to do uncompensated work and that he did not hold staff meetings during lunch breaks.  (*Id.* at 10-11).

Under the NYLL's burden-shifting framework and the FLSA's lowered burden of proof — both of which are the consequences of Defendants' failure to

41

maintain adequate records — the Court determines that Plaintiffs have sufficiently raised a reasonable inference of underpayment because of the automatic meal-break deduction, and that Defendants have failed to put forth evidence challenging the reasonableness of that inference or fulfilling their burden of proving the precise amount of work performed by Plaintiffs.  *See Salinas*, 123 F. Supp. 3d at 472.  Plaintiffs have submitted the actual time and pay records of at least one class member who was underpaid, as well as estimates of underpayment provided by other class members.  The Court can reasonably infer from the existing evidence that the actual meal breaks taken by members of the class, who most likely followed Defendants' official policy of clocking in and out for meals, were shorter than the automatic one-hour deduction.  In contrast, Defendants have proffered no evidence to counter that reasonable inference.  That one onsite residential manager attested to holding staff meetings outside of mealtime does nothing to suggest that Plaintiffs were precisely compensated for all hours worked, especially because that residential manager did not mention or negate other work that Plaintiffs may have done during mealtime.

### iii.    Eight-Hour Rounding

Next, the Court evaluates Plaintiffs' claim that Defendants' eight-hour workday rounding resulted in classwide underpayment in violation of the FLSA and the NYLL.  (Pl. SJ Br. 2-8).  Because rounding is not *per se* unlawful, employees must show that rounding led to systematic underpayment to establish their employer's liability.  *Tay* v. *N.Y. and Presbyterian Hosp.*, No. 22

42

Civ. 8379 (KMK), 2024 WL 4286226, at *8; *Canelas*, 2017 WL 1233998, at *10-11. At the same time, because of the shifting and lowered burden as a result of Defendants' failure to maintain proper records, Plaintiffs in this case need only raise a reasonable inference of uncompensated work, which Defendants must then counter or rebut with evidence of their own. *See Canelas*, 2017 WL 1233998, at *11.

Here, Plaintiffs demonstrate from their sample analysis that more than half of the sampled class members were listed as working exactly eight-hour days for 90 percent of all the days they worked. (Lee Decl., Ex. R). That striking coincidence is substantiated by the time and pay records of those 75 sampled class members (*id.*, Ex. S) as well as by the testimony of Ms. Benjamin, who agreed that "for almost all of the time entries, people were just being automatically clocked in and out for eight hours a day" (*id.*, Ex. G at 40). Furthermore, Plaintiffs show that the rounding resulted in systematic underpayment for Mr. Sanchez, who recorded approximately nine-hour workdays for a period of 10 days but who was paid for only eight hours of work each day during that period. (Pl. SJ Br. 6; Lee Decl., Ex. U). Similarly, Plaintiffs show that in one sampled work week, Mr. Gomez recorded 43.09 hours of work but was paid for only 40 hours of work. (Pl. SJ Br. 7). In addition, Plaintiffs submit the declarations of four other named Plaintiffs and class members, who also testified to working in excess of their recorded hours. (*Id.* at 8).

Once again, Defendants do not deny that they rounded workdays in practice, and they argue only that such a rounding practice was not necessarily unlawful and that Plaintiffs have not carried their burden of showing systematic underpayment. (Def. SJ Opp. 7-9). In this regard, Defendants state that they provided their employees with a 10- to 15-minute grace period every day, implying that any rounding would have evened out over time. (*Id.* at 8). In addition, for both the automatic meal-break deduction and the eight-hour rounding, Defendants contend that any uncompensated time was noncompensable, and that the uncompensated time constituted such a *de minimis* amount that any discrepancy would not be unlawful. (*Id.* at 12-15).

The Court finds that Plaintiffs have provided sufficient evidence of a reasonable inference of systematic underpayment that has not been countered or rebutted by Defendants — who, for their part, have provided no evidence that their rounding practice resulted in a neutral outcome. In fact, Defendants have not pointed to a single employee record showing that an individual worked less than an eight-hour day but was compensated for eight hours, which could have countered Plaintiffs' evidence showing that Defendants' practice resulted only in rounding down.

Furthermore, Plaintiffs' evidence demonstrates that Defendants' rounding practice — together with their automatic meal-break deduction — resulted in discrepancies of approximately one hour per day, during which period Plaintiffs spent more than a *de minimis* amount of time performing actual work activities. *Cf. Reich* v. *N.Y.C. Transit Auth.*, 45 F.3d 646, 652-53

44

(2d Cir. 1995) (determining that a few minutes of extra work, which occurred infrequently and proved difficult to track, should be considered *de minimis* and need not be compensated); *Kavanagh* v. *Grand Union Co., Inc.*, 192 F.3d 269, 271-72 (2d Cir. 1999) (explaining that commuting time and activities done before or after principal job duties are considered to be noncompensable).  (*See* Pl. SJ Br. 6-7; Lee Decl., Ex. U).  Therefore, under the burden-shifting and lowered burden frameworks of the NYLL and the FLSA, respectively, the Court determines that Defendants are liable for unlawful rounding.

### b.    Defendants Are Liable for Violating NYLL Section 191's Weekly Payment Requirement

In addition to classwide underpayment, Plaintiffs also claim that Defendants failed to pay the biweekly subclass on a weekly basis in violation of the NYLL.  Section 191, which is part of Article 6 of the NYLL, provides that "[a] manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned."  N.Y. Lab. Law § 191(1)(a)(i).  The statute defines the term "manual worker" as "a mechanic, workingman[,] or laborer."  *Id.* § 190(4).

As additional context, the New York State Department of Labor (the "NYSDOL"), whose interpretation is given judicial deference in New York state courts, has "interpreted the term to include employees who spend more than 25 percent of their working time performing physical labor, with physical labor broadly includ[ing] a wide range of physical activities undertaken by employees." *Balderramo* v. *Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207, 225 & n.10 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting N.Y. Dep't of Lab.

45

Op. Letter, No. RO-09-0066 (May 21, 2009)).  Typically, the NYSDOL "looks at the duties performed by an employee in order to determine whether he or she is a manual worker and makes a case-by-case determination."  *Id.* at 225-26.

A separate provision in Article 6 of the NYLL states that any employee who is "paid less than the wage to which … they are entitled" may bring a "wage claim."  N.Y. Lab. Law § 198.  While there is a split among New York appellate courts on whether Section 191 together with Section 198 "confer[ ] a private right of action," *Zachary* v. *BG Retail, LLC,* 716 F. Supp. 3d 339, 347 (S.D.N.Y. 2024), courts in this Circuit have generally found that private parties may proceed on this cause of action, *see id.* at 350-51; *see also Ramirez* v. *Urion Constr. LLC,* 674 F. Supp. 3d 42, 52-53 (S.D.N.Y. 2023) (collecting cases). The parties do not dispute that Plaintiffs may proceed on this claim, and the Court agrees with its sister courts that "an unlawfully late payment of wages is an 'underpayment' within the meaning of Section 198, rendering violations of Section 191 privately actionable."  *Zachary,* 716 F. Supp. 3d at 351.

In support of their claim, Plaintiffs present evidence that (i) approximately 20 percent of the sampled class members received biweekly rather than weekly payments and (ii) the job duties of their positions — that is, the job duties of porters, doormen/concierges, handymen, and custodians employed by Defendants during the relevant period — qualified them as manual workers.  (Pl. SJ Br. 8-11; *see* Lee Decl., Ex. R; *id.,* Ex. G at 67-69).[7]

---

[7]    The Court notes that Plaintiffs use the terms "doormen" and "concierges" interchangeably, and that Plaintiffs do not discuss the job duties of custodians.  The

Specifically, Plaintiffs rely on the testimony of Ms. Benjamin to explain the nature of the work for each position.  According to Ms. Benjamin, porters are "generally responsible for maintaining cleanliness," including cleaning up garbage, vacuuming, and mopping, while handymen are tasked with fixing appliances and fixtures in residential units.  (Lee Decl., Ex. G at 68-69).  In contrast, concierges are "generally sitting" and "[a]nnouncing guests," but Ms. Benjamin also acknowledged that "a big function" of their job duties includes organizing packages and bringing them to residents due to "purchasing habits ... these day[s]."  (*Id.* at 67-68).  Indeed, Ms. Benjamin agreed that dealing with packages is "almost all of their job."  (*Id.* at 68).

Defendants do not dispute that they paid the biweekly subclass on a biweekly basis; they do not dispute that the job duties of porters and handymen qualified as manual work; and they do not dispute that organizing packages could also qualify as manual work.  Rather, the only challenge Defendants seem to bring is to "whether any specific concierge spen[t] more than 25 percent of their working time performing physical labor due to 'an amazing amount of packages,'" an inquiry that Defendants believe "var[ies] greatly depending on the location the concierge work[ed,] depending on the number of residents, and the shift on which the concierge work[ed,] as there would understandably be fewer deliveries to facilitate on an overnight shift than on a day shift."  (Def. SJ Opp. 16).  Specifically, Defendants mused that

Court therefore considers doormen to have the same job duties as concierges, and it excludes custodians from the biweekly subclass.

47

"[i]t is likely that an overnight concierge is spending an overwhelming amount of their shift sitting at the desk and occasionally announcing guests, and less than 25[ percent] of working time engaged in manual labor relating to packages." (*Id.*).  In general, Defendants also state that the determination of a manual worker "is a fact-specific inquiry ill-suited to summary judgment." (*Id.*).

The Court acknowledges that the manual worker question may be a close call with respect to concierges, but it ultimately grants summary judgment to Plaintiffs on this issue.  *First*, even though Defendants do not dispute this point, the Court finds that employees who spend more than 25 percent of their working time moving and organizing packages qualify as manual workers under the NYLL because they are "required to do light to medium lifting and carrying of objects."  *Balderramo*, 668 F. Supp. 3d at 228; *see id.* at 226 (explaining that the NYSDOL determined that an airport chauffeur qualified as a manual worker because "while the chauffeur's main duty was driving to and from the airport, he also refueled the vehicle, loaded and unloaded luggage, opened and closed doors for passengers, and spent 20 minutes per day washing the vehicle").  Indeed, while the main duties of a concierge may be to sit at the front desk, greet residents, and announce guests, he is also spending meaningful time receiving, organizing, and moving packages, especially given the prevalence of online ordering in today's urban society.

*Second*, in this case, the Court does not find that there is a genuine dispute of material fact over the threshold amount of time that *Defendants'*

48

concierges spent dealing with packages to defeat summary judgment.  Plaintiffs have put forth sufficient evidence demonstrating that concierges who worked for Defendants spent at least a quarter of their time sorting packages.  (Lee Decl., Ex. G at 68 (Ms. Benjamin testifying that packages is "a big function" of concierge job duties and agreeing that her concierges do so for "almost all of their job"); Buie Decl. ¶ 5 (Mr. Buie attesting that "[a]s part of [his] duties as a doorman/concierge, [he] would spend almost all of [his] day receiving and organizing packages and deliveries for the tenants of [his] building"); Cabreja Decl. ¶ 6 (Mr. Cabreja attesting that as a doorman, he would spend more than half of his day performing physical duties, including "holding doors and handling and transporting delivery packages for tenants")).

While the Court accepts the theoretical possibility that concierges on night shifts may have fewer packages to sort, the fact remains that Defendants have presented no evidence allowing the Court to draw such an inference.  As the Court has already explained, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak*, 88 F.3d at 71.

### c.    Defendants Are Liable for Failing to Provide Wage and Hour Notices and Wage Statements Under the NYLL

Next, Plaintiffs claim that Defendants failed to provide them with wage and hour notices and wage statements as required by the NYLL.  Under Section 195 of the NYLL, which was adopted as part of New York's Wage Theft Prevention Act (the "WTPA"), an employer must

49

> provide an employee, at the time of hiring, with a notice [i] describing the employee's rate of pay for regular and for overtime hours; [ii] stating whether the employer intends to credit allowances for items such as tips, meals, and lodging toward the employee's minimum wage; [iii] describing certain health care benefits; and [iv] providing other basic information.

*Guthrie* v. *Rainbow Fencing Inc.*, 113 F.4th 300, 303 (2d Cir. 2024) (citing N.Y. Lab. Law § 195(1)(a)).  "In addition, each time wages are paid, the employer must furnish a statement detailing the calculation of regular and overtime pay for that pay period, along with information on deductions and minimum wage allowances."  *Id.* (citing N.Y. Lab. Law § 195(3)).  The NYLL "provides for statutory damages of up to $10,000 for the failure to provide the required wage notices and wage statements."  *Id.* (citing N.Y. Lab. Law § 198(1)(b), (d)).

According to Plaintiffs, Defendants failed to provide wage and hour notices for the three named Plaintiffs and 31 sampled class members.  (Pl. SJ Br. 13; Pl. 56.1 ¶ 81; *see* Lee Decl., Ex. R).  For example, Plaintiffs explain that Defendants provided blank wage notices to Mr. Sanchez, Mr. Buie, and three sampled class members for signature at the time of hiring.  (Pl. SJ Br. 13; Pl. 56.1 ¶ 82; *see* Lee Decl., Ex. W).  What is more, Plaintiffs claim that Defendants "failed to provide accurate wage statements to [c]lass [m]embers due to the time shaving alleged by Plaintiffs and proven by Defendants' records," namely, the automatic meal-break deduction and the eight-hour rounding.  (Pl. SJ Reply 11).

Defendants do not dispute that they did not provide Plaintiffs with the wage and hour notices and wage statements as required by the NYLL.  Rather,

50

citing *Guthrie*, Defendants argue that Plaintiffs lack Article III standing to pursue their WTPA claim because they "have not alleged an injury-in-fact resulting from the alleged failure to provide the wage notices and wage statements." (Def. SJ Opp. 18). In *Guthrie*, the Second Circuit made clear that, in the context of WTPA claims, employees must demonstrate an injury-in-fact by "show[ing] some causal connection between the lack of accurate notices and the downstream harm." 113 F.4th at 308. Because the plaintiff in *Guthrie* identified only technical violations of the WTPA and "potential harms that *could* result from an employer's failure to provide wage notices and wage statements" — without alleging any downstream harm to himself — the Second Circuit determined that "his claim for statutory damages was properly dismissed" for lack of standing. *Id.* at 305, 310. Nevertheless, the Second Circuit explained that "a plaintiff-employee who has plausibly shown that defective notices led him or her to lose wages has such a concrete interest and is not simply policing legal infractions in the abstract." *Id.* at 310.

Here, the Court determines that Plaintiffs have adequately alleged and established actual and concrete downstream harm as a result of Defendants' failure to provide the required wage and hour notices and wage statements. Plaintiffs have shown that "Defendants' violations impaired their ability to seek relief due to a lack of information." (Pl. SJ Reply 11). More than that, Plaintiffs have proved, and the Court agrees, that Defendants' failure to maintain proper wage statements because of their automatic meal-break deduction and eight-hour rounding led Plaintiffs to lose wages. (*See supra* C.2.a). These are exactly

51

the types of harm that the Second Circuit considered to be sufficient to establish standing in *Guthrie*. Therefore, the Court finds for Plaintiffs on this issue.

### d.    Plaintiffs Are Entitled to Liquidated Damages

Because of Defendants' underpayment and delayed payment of wages, Plaintiffs ask this Court to award liquidated damages. (Pl. SJ Br. 13-15). The FLSA "provides that an employer who underpays an employee is 'liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.'" *Rana* v. *Islam*, 887 F.3d 118, 122 (2d Cir. 2018) (per curiam) (quoting 29 U.S.C. § 216). The NYLL also contains a liquidated damages provision that is functionally the same as the one in the FLSA, though the Second Circuit has "interpret[ed] the NYLL and [the] FLSA as not allowing duplicative liquidated damages for the same course of conduct." *Id.* at 122-23. Under both statutes, "[c]ourts have discretion to deny an award of liquidated damages where the employer shows that, despite the failure to pay appropriate wages, the employer acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing that the acts or omissions giving rise to the failure did not violate the FLSA" and the NYLL. *Herman*, 172 F.3d at 142; *Rana*, 887 F.3d at 122-23 (explaining that the NYLL's liquidated damages provision is similar to that of the FLSA in shifting the burden to the employer to prove a good-faith basis for the underpayment of wages). The Second Circuit has explained that the "employer bears the burden

of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception." *Herman*, 172 F.3d at 142.

Here, the Court agrees with Plaintiffs that Defendants have failed to carry their burden of showing subjective good faith or objective reasonableness. Defendants argue that "[t]he practice of time rounding and automatic break deductions are not in and of themselves unlawful, and even assuming *arguendo* that these policies did result in an alleged underpayment, that does not meet the willfulness or lack of good faith standards necessary to impose liquidated damages at the summary judgment stage." (Def. SJ Opp. 22). Nevertheless, Defendants offer no evidence demonstrating their good-faith effort to comply with the statutory requirements or the reasonableness of their policies. To the contrary, Defendants failed to maintain proper employee records; their practices of automatic meal-break deduction and eight-hour rounding contradicted their own official policy of requiring employees to clock in and clock out; and those practices resulted in systematic underpayment. Therefore, following the common practice in wage and hour cases, the Court determines that Plaintiffs are entitled to a single set of liquidated damages for Defendants' conduct. *See Herman*, 172 F.3d at 142.

### e. The Court Extends the FLSA's Statute of Limitations to Three Years

Finally, Plaintiffs ask this Court to extend the FLSA's two-year statute of limitations to three years in light of Defendants' alleged willfulness. (Pl. SJ Br. 15). In general, the FLSA provides a two-year statute of limitations for

minimum wage, overtime, and liquidated damages claims.  29 U.S.C. § 255(a).

Nevertheless, the statute of limitations is extended to three years for "a cause

of action arising out of a willful violation."  *Id.*; *see Herman,* 172 F.3d at 141.

"The accepted standard for determining willful behavior, for which plaintiff

bears the burden of proof, … [is] 'that the employer either knew or showed

reckless disregard for the matter of whether its conduct was prohibited by the

statute.'"  *Herman,* 172 F.3d at 141 (quoting *McLaughlin* v. *Richland Shoe Co.,*

486 U.S. 128, 133 (1988)); *see Young* v. *Cooper Cameron Corp.,* 586 F.3d 201,

207 (2d Cir. 2009).  "Mere negligence is insufficient."  *Young,* 586 F.3d at 207.

Plaintiffs claim that Defendants' actions were willful because they

refused to maintain proper records and instead made up time entries and

deducted hour-long meal breaks when the punch records showed that class

members should have been compensated for on-the-clock time.  (Pl. SJ Br. 15;

Pl. SJ Reply 11-12).  In response, Defendants contend only that courts

generally leave the issue of willfulness to the trier of fact.  (Def. SJ Opp. 22-23).

While willfulness is a high standard to satisfy, the Court ultimately finds

that Plaintiffs' evidence is sufficient to establish Defendants' reckless disregard

for FLSA compliance.  For example, as an official policy, Defendants instructed

their employees to clock in and out during meal breaks, but in practice,

Defendants automatically deducted an hour for such breaks.  (Lee Decl., Ex. G

at 34).  At the very least, Defendants were aware that their automatic meal-

break deduction could result in underpayment when recorded breaks were

54

shorter than an hour.  Their unwillingness to honor their own policy and pay according to actual time records thus reflects their reckless disregard.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED, and Plaintiffs' motion for partial summary judgment is also GRANTED.  Plaintiffs' proposed class notice (Dkt. #152-2) is APPROVED with the following modification:  Plaintiffs must exclude from the biweekly subclass any employees who worked as custodians for Defendants.

The parties are directed to submit a joint letter on or before **March 9, 2026**, outlining next steps on damages, attorney's fees and costs, and Plaintiffs' remaining claims.  The parties should indicate to the Court whether they would like to be referred to the Magistrate Judge for an inquest into damages and/or attorney's fees and costs.

The Clerk of Court is directed to terminate the pending motions at docket entries 152 and 154.

SO ORDERED.

Dated:   February 23, 2026
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

55